927 A.2d 154 (2007)
394 N.J. Super. 430
STATE of New Jersey, Plaintiff-Respondent,
v.
Joseph R. MAROLDA, Sr., Defendant-Appellant, and
Joseph R. Marolda, Jr., Defendant.
Superior Court of New Jersey, Appellate Division.
Argued January 30, 2007.
Decided July 12, 2007.
*156 Michael L. Testa, Vineland, argued the cause for appellant (Basile & Testa, attorneys; Michael L. Testa, Jr., on the brief).
Russell J. Curley, Deputy Attorney General, argued the cause for respondent (Stuart Rabner, Attorney General, attorney; Mr. Curley, of counsel and on the brief).
Before Judges SKILLMAN, LISA[1] and GRALL.
The opinion of the court was delivered by
GRALL, J.A.D.
Pursuant to a negotiated plea agreement, defendant Joseph R. Marolda, Sr. pled guilty to maintaining a controlled dangerous substance production facility, a crime of the first degree, N.J.S.A. 2C:35-4. In return for defendant's plea of guilty, the State agreed to dismiss the remaining three counts of the indictment, in which he was charged with possession of more than fifty grams of marijuana, N.J.S.A. 2C:35-10a(3), possession of more than fifty marijuana plants with intent to distribute, N.J.S.A. 2C:35-5b(10)(a), and conspiracy to possess more than fifty marijuana *157 plants with intent to distribute, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:35-5b(10)(a). The State also agreed to leave sentencing to the discretion of the judge, who had stated his intention to impose a fifteen-year term of incarceration, five years to be served without possibility of parole. Although defendant did not condition his plea on the right to appeal, the State agreed to recommend bail pending appeal secured by defendant's residence.
The judge sentenced defendant to a fifteen-year term of incarceration with a five-year period of parole ineligibility and imposed a $3000 DEDR penalty, a $50 lab fee, a $50 VCCB assessment, a $75 SNSF assessment and a $30 LEOTEF penalty. In addition, the judge required defendant to provide a DNA sample and revoked his driving privileges for six months. The judge granted bail pending appeal secured by defendant's residence.
Defendant raises the following issues on appeal:
I. THE MOTION JUDGE ERRED IN FAILING TO SUPPRESS ALL OF THE EVIDENCE DERIVED FROM THE INITIAL UNLAWFUL SEARCHES AS SUCH EVIDENCE IS FRUIT OF THE POISONOUS TREE.
A. The repeated aerial surveillance at 150 to 200 feet above the Marolda property was a violation of defendant's reasonable expectation of privacy under the Fourth Amendment of the United States Constitution and Art. 1 paragraph 7 of the New Jersey Constitution.
B. Exigent circumstances to enter the Marolda property did not exist. Therefore, any evidence obtained from the unlawful search and seizure constitutes fruit from the poisonous tree.
II. DEFENDANT'S STATEMENTS MUST Be EXCLUDED AS THEY WERE IN VIOLATION OF MIRANDA V. ARIZONA, JACKSON V. DENNO, THE FIFTH AMENDMENT, AND NEW JERSEY'S COMMON-LAW RIGHT AGAINST SELF INCRIMINATION.
III. THE MOTION JUDGE ERRED IN FAILING TO DISMISS THE INDICTMENT IN ITS ENTIRETY.
IV. THE INVOLVEMENT OF THE NATIONAL GUARD AND THE UNITED STATES COAST GUARD PRESENT A SITUATION WHERE ARMED FORCES ARE INVOLVED IN A PURELY DOMESTIC CRIMINAL INVESTIGATION IN VIOLATION OF THE POSSE COMITATUS ACT AND THE NEW JERSEY CONSTITUTION.
V. THE TESTIMONY SUPPORTING THE APPLICATION SEEKING THE SEARCH WARRANT CONTAINED EITHER DELIBERATE FALSEHOODS OR A RECKLESS DISREGARD FOR THE TRUTH.
We will not consider the arguments raised in Points II and III of defendant's brief. "`Generally, a defendant who pleads guilty is prohibited from raising, on appeal, the contention that the State violated his constitutional rights prior to the plea.'" State v. Knight, 183 N.J. 449, 470, 874 A.2d 546 (2005) (quoting State v. Crawley, 149 N.J. 310, 316, 693 A.2d 859 (1997)). A plea of guilty amounts to a waiver of all issues, including constitutional claims, that were or could have been raised in prior proceedings. Tollett v. Henderson, 411 U.S. 258, 267, 93 S.Ct. 1602, 1608, 36 L.Ed.2d 235, 243 (1973) (explaining that "a guilty plea represents a break in the chain of events which has preceded" and holding that a defendant who "has solemnly admitted in open court that he is in fact guilty of the offense . . . *158 may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred" before the plea was entered). "Included within those constitutional rights that are deemed waived after entering an unconditional guilty plea are the privilege against compulsory self-incrimination, the right to trial by jury, the right to confront one's accusers, and the right to a speedy trial.'" Knight, supra, 183 N.J. at 470, 874 A.2d 546 (quoting Crawley, supra, 149 N.J. at 316, 693 A.2d 859). While the Rules of Court include exceptions that permit appeal following a guilty plea, none apply to permit a challenge to denial of a motion to suppress a defendant's statements or non-jurisdictional defects in grand jury proceedings. See Knight, supra, 183 N.J. at 471, 874 A.2d 546; State v. Robinson, 224 N.J.Super. 495, 500-01, 540 A.2d 1313 (App.Div.1988); cf. R. 3:5-7(d) and R. 7:5-2(c)(2) (permitting appeal from denial of a motion to suppress physical evidence after a guilty plea); R. 3:28(g) (permitting appeal from denial of admission into a pretrial intervention program following a plea of guilty); R. 3:9-3(f) (permitting appeal of an issue preserved by entry of a conditional plea). Because defendant did not preserve the issues raised in Points II and III by entry of a conditional guilty plea, he has waived his right to relief on either claim. R. 3:9-3(f). Only his right to challenge the denial of his motion to suppress physical evidence is preserved by force of Rule 3:5-7(d).
The facts relevant to defendant's motion to suppress are as follows. Detective Sherma of the Buena Borough Police Department contacted Sergeant Samuel V. Cucciniello of the Atlantic County Prosecutor's Office to report that a confidential informant had told him that he had seen marijuana growing in a cornfield on defendant's farm. Cucciniello called the Marijuana Eradication Unit (MEU) of the New Jersey Division of State Police for assistance. The members of the MEU, sometimes aided by members of the National Guard, cooperate with local law enforcement officers. When Cucciniello called the MEU, he was told that the MEU did not have a helicopter available to fly over defendant's farm until September 9. Concerned that the crop would be harvested before that date and at the guardsman's suggestion, Cucciniello called the Coast Guard. A flight was arranged for the morning of September 2.
On September 2, Sherma and a lieutenant from the Atlantic County Prosecutor's Office went to the prosecutor's office to await any information that Sherma could include in an application for a warrant authorizing a search of defendant's property. A detective from the State Police and a detective from the Buena Borough Police Department went to Pomona airport to fly with the Coast Guard. Sergeant Cucciniello met officers of the State Police and guardsmen who were assigned to the MEU. They traveled to defendant's property in a van and parked in a driveway across the street from defendant's cornfield.
Lieutenant Grooms of the Coast Guard was one of the two pilots assigned to the flight. Grooms explained that normal helicopter operations are low and slow, at an altitude that is generally between "a few hundred" and "3000" feet. His assignment was to take the officers on a flight over defendant's fields and drop the officers off after the flight. They flew into the area "fairly high," "probably" at 1000 feet, to get an overview and locate flight hazards such as buildings, power lines and trees. The officers on the ground communicated with the pilots and directed them to the field. When the helicopter got a "little lower" but still "pretty high up," the growth in the field was "very visible." *159 Grooms saw that there was one section of the cornfield that "stuck out like a sore thumb" because it was a different shade and texture. When the officers on the ground directed the pilots to "go on board the property," they descended from 800 feet to "just a couple of hundred feet above the ground." When they were just over a couple hundred feet above the ground, the officer from the MEU was able to look right down at the field. He had binoculars and identified marijuana. As they descended to a lower altitude, "a little bit lower," the flight mechanic saw someone in the rows of corn cutting marijuana. The pilot could not say what the altitude of the helicopter was when the flight officer saw the person in the field.
A detective in the helicopter radioed the officers in the van to report that they saw someone in the field cutting marijuana plants. They drove onto defendant's property and ran to the cornfield behind the house. One officer yelled to defendant and directed him to come out of the field. He was placed on the ground, handcuffed and guarded. Cucciniello retrieved a pair of clippers that were next to defendant on the ground. The officers searched for others in the field who could destroy the evidence but found no one else in that area.
Grooms acknowledged that at some point during the flight the altitude was between 150 to 200 feet. He videotaped from the aircraft, but not until after defendant was on the ground. The videotape was shown at the suppression hearing. Cucciniello, who was shown the videotape during his testimony at the suppression hearing, described the property as containing a residence, two cornfields, a welding shop and a shed. The cornfields were behind and to the side of the house. Grasses and ragweed grew in the front of and into the field behind the house along its border. Behind that cornfield there was an open grassy area and then a wooded area. A dirt road, posted with a no trespass sign, separated the two cornfields. The officers passed a welding shop when they drove onto defendant's driveway. The location of the shed, which was marked on a diagram introduced into evidence, is not clear from the record.[2]
After the cornfield was secured, Cucciniello called Sherma at the prosecutor's office. He also called the nearby State Police barracks for assistance.
After receiving Cucciniello's call, Sherma appeared before a judge of the Superior Court in order to obtain a warrant. He testified that he had received information from a confidential informant who had seen marijuana growing in defendant's cornfield and seen defendant bringing water and peat moss into a wooded area on the farm beyond the cornfield. The informant had never before given Sherma information, but Sherma knew his name. Sherma further explained that officers conducting an aerial surveillance that morning had seen at least five marijuana plants growing in the cornfield and people cutting them down. He told the judge that officers had gone onto the property to prevent them from destroying more plants. When the judge asked about the altitude of the helicopter, Sherma said he was "under the impression" that it was "less than 800 feet." Sherma also advised the judge that in 1991 officers executing a search warrant for defendant's farm had found a large amount of marijuana and $150,000. As a consequence, in 1992 defendant was convicted of possession of marijuana with intent to distribute.
The judge issued a warrant authorizing a search of the property, the residence and the out buildings.
*160 Before the officers returned with the warrant, defendant's son came out of the house. His girlfriend Laura Kousmine was with him. According to Kousmine, she had looked out the bedroom window of the ranch house and saw a helicopter hovering no higher than a telephone pole. From the bathroom window, she saw defendant lying on the ground. Although she visited the residence regularly, she had never seen a helicopter in the area before. Neither had Joseph Pinto, who rented workspace in one of defendant's outbuildings.
Kousmine saw a neighbor, Jeffrey Sprang, on defendant's property while the officers were there. She heard one of the officers greet Sprang as "the hero of the day." According to defendant, Sprang is a part-time police officer who recently had come onto defendant's property without permission or invitation. Kousmine and Pinto both testified that they had seen Sprang on the property a few weeks before the search.
A subsequent search pursuant to the warrant disclosed twenty-eight marijuana plants growing in the cornfield, 154 marijuana plants growing under the trees in the wooded area of the property, a sifter and scale in the shed, dismantled equipment used for growing marijuana indoors and a safe. A second warrant authorizing a search of the safe was obtained. It contained $48,000.
Defendant's attorney asked the motion judge to suppress the evidence for the following reasons: Sprang was the confidential informant and his unauthorized entry onto defendant's property tainted the search; the helicopter flight was an unreasonable search because of its low altitude over the backyard of a residence; and the search was unlawful because the Coast Guard assisted.
Subject to the prosecutor's submission of confirming evidence for in camera review, the judge accepted the prosecutor's representation that Sprang was not the informant. He credited Grooms's testimony about the flight. He found that the helicopter was flying at approximately 1000 feet when the officers first flew over and circled the property, and was flying lower and slower when the fields were visible and the pattern of different vegetation "stuck out like a sore thumb." After seeing the pattern, the officers flew lower to confirm the presence of marijuana. The judge, noting that he would "not wish to live in any state or country [where] we had hovering helicopters in the backyards of citizens," held that what was done in this case was constitutionally reasonable. The judge summarized his findings as follows: "Initial pattern confirmation. Then lower and slower, more specific confirmation, which indeed led to the" observation of the cutting of the marijuana, which was an exigency that justified the officers' entry and the securing of the evidence in the field.
The judge rejected defendant's claim that the observations were unlawful because of the involvement of federal officers. He found that the assistance provided by the Coast Guard and guardsmen was neither unreasonable nor barred by the Posse Comitatus Act, 18 U.S.C.A. § 1385.
On the day following the suppression motion, the judge wrote to the attorneys and advised that he had reviewed the prosecutor's submission regarding the confidential informant and concluded that there was "no doubt whatsoever that he/she exists and is not the police officer neighbor[, Sprang.]" The judge also supplemented his findings to refer to an airport within five miles of defendant's property which is used by crop-dusting aircraft.
*161 Assuming without deciding that defendant's claim based on false representations in connection with the issuance of the warrant is preserved pursuant to Rule 3:5-7(d), that claim lacks sufficient merit to warrant more than brief comment. R. 2:11-3(e)(2). Defendant's claim is that Sherma withheld evidence about the altitude of the helicopter and identity of the informant that was material to obtaining the warrant.
The record does not support either assertion. The judge who issued the warrant asked Sherma about the altitude of the helicopter after Sherma represented that the officers had seen five marijuana plants in the cornfield. Sherma explained that he was "under the impression" that the officers were flying at less than 800 feet. The judge who decided the suppression motion permitted defendant to present testimony about Sprang's alleged unauthorized entry. After hearing that testimony, the judge granted defendant's application to require the State to disclose the identity of the informant to the court. After reviewing the information provided, the judge determined that there was an informant who was not Sprang.
To require further relief on the ground that a material misrepresentation led to the issuance of the warrant, defendant was required to make "a substantial preliminary showing that [Sherma], either deliberately or with reckless disregard for the truth, failed to apprise the issuing judge of material information which, had it been included in the affidavit, would have militated against issuance of the search warrant." State v. Sheehan, 217 N.J.Super. 20, 25, 524 A.2d 1265 (App.Div.1987); see Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978); State v. Howery, 80 N.J. 563, 567, 404 A.2d 632, cert. denied, 444 U.S. 994, 100 S.Ct. 527, 62 L.Ed.2d 424 (1979). He did not make that showing.
Defendant's contention that assistance provided by members of the Coast Guard and National Guard requires suppression of the evidence seized pursuant to a warrant also lacks sufficient merit to warrant discussion. R. 2:11-3(e)(2). Defendant points to no decision from any jurisdiction that has held that evidence acquired in accordance with the constitutional limitations on search and seizure should be suppressed because members of either the Coast Guard or National Guard assisted the state or local law enforcement officers in an investigation. There is persuasive authority to the contrary. See United States v. Roberts, 779 F.2d 565, 568 (9th Cir.), cert. denied, 479 U.S. 839, 107 S.Ct. 142, 93 L.Ed.2d 84 (1986); United States v. Wolffs, 594 F.2d 77, 85 (5th Cir. 1979); United States v. Walden, 490 F.2d 372, 376-77 (4th Cir.), cert. denied, 416 U.S. 983, 94 S.Ct. 2385, 40 L.Ed.2d 760 (1974); Doggett v. State, 791 So.2d 1043, 1048-50 (Ala.Crim.App.2000); Harker v. State, 637 P.2d 716, 719 (Alaska Ct.App. 1981), aff'd, 663 P.2d 932 (1983); People v. Hayes, 144 Ill.App.3d 696, 699, 98 Ill.Dec. 911, 494 N.E.2d 1238 (1986).
The question remains whether the judge erred in concluding that the helicopter surveillance was constitutionally reasonable. Giving deference to findings based on credibility, we review a decision on a motion to suppress to determine whether the judge's findings are supported by credible evidence and the legal conclusions are valid. State v. Alvarez, 238 N.J.Super. 560, 564, 570 A.2d 459 (App. Div.1990).
The general legal principles are clear. "The similarly worded provisions of the Fourth Amendment of the United States Constitution and Article 1, paragraph 7 of the New Jersey Constitution protect citizens *162 against unreasonable police searches and seizures by requiring warrants issued upon probable cause unless the search falls within one of the few well-delineated exceptions to the warrant requirement." State v. Johnson, 171 N.J. 192, 205, 793 A.2d 619 (2002) (internal quotations and alterations omitted). In this case there is a preliminary question whether the area searched is one that is protected by the constitutional restrictions on government intrusion.
Open fields are not protected by the text of the Fourth Amendment or any constitutionally recognized interest in the privacy of land beyond the curtilage of a home. Oliver v. United States, 466 U.S. 170, 177-78, 104 S.Ct. 1735, 1740-41, 80 L.Ed.2d 214, 223-24 (1984); see United States v. Dunn, 480 U.S. 294, 300, 107 S.Ct. 1134, 1139, 94 L.Ed.2d 326, 334 (1987); State v. Nikola, 359 N.J.Super. 573, 581-82, 821 A.2d 110 (App.Div.), certif. denied, 178 N.J. 30, 834 A.2d 404 (2003). "Curtilage is land adjacent to a home and may include walkways, driveways, and porches." State v. Domicz, 188 N.J. 285, 302, 907 A.2d 395 (2006). The "centrally relevant consideration [is] whether the area in question is so intimately tied to the home itself that it should be placed under the home's `umbrella' of Fourth Amendment protection." Dunn, supra, 480 U.S. at 301, 107 S.Ct. at 1140, 94 L.Ed.2d at 335. Thus, even within the curtilage of a home, the "area to which the public is welcome, such as a walkway leading to an entrance to a home, is not afforded Fourth Amendment protection because the resident has given implicit consent to visitors to approach the home that way." Domicz, supra, 188 N.J. at 302, 907 A.2d 395; Nikola, supra, 359 N.J.Super. at 581-82, 821 A.2d 110. For purposes of the Fourth Amendment, curtilage does not include land used for activities such as cultivation of crops, whether or not that land is fenced or posted against trespass. Oliver, supra, 466 U.S. at 179, 104 S.Ct. at 1739, 80 L.Ed.2d at 224 (noting that fences and no trespass signs are not generally effective in barring the public from viewing open fields in rural areas and declining to adopt a case-by-case approach depending upon whether the property is fenced or posted against trespass). See generally 1 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.4(a) (4th ed. 2004).
We cannot conclude that the State Constitution provides protection to open fields used for cultivation of crops that is not afforded by the Fourth Amendment. Even within the curtilage where there generally is an expectation of privacy recognized as reasonable, the Court has applied exceptions based on the unreasonableness of an expectation in privacy in areas of the curtilage where visitors are expected. See Domicz, supra, 188 N.J. at 302, 907 A.2d 395; Johnson, supra, 171 N.J. at 206-09, 793 A.2d 619. Defendant points to no special local concerns and to "nothing in the history of Article I, paragraph 7, in preexisting State law, or in the prevailing attitudes of the public that would warrant" greater protection for fields used to cultivate corps. See Joye v. Hunterdon Cent. Reg'l High Sch. Bd. of Educ., 176 N.J. 568, 607-08, 826 A.2d 624 (2003) (citing State v. Hunt, 91 N.J. 338, 359-68, 450 A.2d 952 (1982) (Handler, J., concurring) (discussing criteria for construing New Jersey's constitution more broadly than parallel provisions of the United States Constitution)). Concerns about disclosure of personal information that individuals reasonably expect to keep private are not implicated where open fields used to cultivate crops are at issue. Cf. State v. Hempele, 120 N.J. 182, 576 A.2d 793 (1990) (garbage left for pick-up in *163 closed container); Hunt, supra, 91 N.J. 338, 450 A.2d 952 (telephone toll records).
In this case, the area subjected to aerial observation from a low flying helicopter was an open field used to grow corn. It was separated from the residence by a row of weeds growing into the field. See State v. Martwick, 231 Wis.2d 801, 604 N.W.2d 552 (2000) (noting that marijuana grown beyond the area where weeds and brush were cut was not within the curtilage). The officers secured a helicopter to view defendant's cornfields, not his residence.
The officers flew into the area of defendant's property at 1000 feet and circled. They were directed to the cornfields by officers who had positioned themselves across the street from defendant's farm. After identifying the fields, the pilot flew lower and saw the pattern of distinct vegetation growing with the corn in the field. That distinct-colored vegetation was the focus when the helicopter descended farther. From a lower altitude, a detective onboard identified the vegetation as marijuana and the flight mechanic saw a person cutting the vegetation. The motion judge credited the testimony given by Grooms. Grooms further explained that when he flew lower, the detective was able to look directly down onto the open field used for cultivation of corn. There was no support for a finding that this field or its use was intimately tied to the home.
We see no basis for a claim that this helicopter flight involved an invasion of any reasonable expectation of privacy within the curtilage of defendant's residence. As the decision of the motion judge suggests, although not with unmistakable clarity, this helicopter was not flying low over a backyard and the surveillance was not of a residence or its curtilage. When the helicopter descended, the officers were above and looking into a field of corn.
The initial flight over the entire property did not invalidate or taint the observation of marijuana in the cornfield. In California v. Ciraolo, 476 U.S. 207, 209, 106 S.Ct. 1809, 1810-11, 90 L.Ed.2d 210, 214 (1986), the United States Supreme Court considered a case in which the police received an anonymous tip and secured a private plane to fly over the defendant's house and fenced-in backyard at an altitude of 1000 feet. From the airspace, the officers identified marijuana growing in a walled-in garden that the State conceded was within the curtilage of the residence. Ibid. Based on their observations, the officers obtained a search warrant. Ibid. The Court held that the aerial surveillance of the curtilage from a plane at an elevation of 1000 feet was proper and did not violate the Fourth Amendment. 476 U.S. at 211-15, 106 S.Ct. at 1811-14, 90 L.Ed.2d at 215-18. The Court reasoned that "[i]n an age where private and commercial flight in the public airways is routine, it is unreasonable for [the defendant] to expect that his marijuana plants were constitutionally protected from being observed with the naked eye from an altitude of 1,000 feet." 476 U.S. at 215, 106 S.Ct. at 1813, 90 L.Ed.2d at 218. The Court concluded that the inspection was not a search subject to the Fourth Amendment. Ibid.
In Florida v. Riley, 488 U.S. 445, 447-48, 109 S.Ct. 693, 695, 102 L.Ed.2d 835, 840 (1989), the Court considered whether observation of the interior of a greenhouse within the curtilage of a residence from a helicopter 400 feet above was a search that required a warrant. Relying on Ciraolo, a plurality of the Court held that the defendant's Fourth Amendment rights were not violated because the flight did not violate aviation regulations. 488 U.S. at 452, 109 *164 S.Ct. at 697, 102 L.Ed.2d at 843.[3] Justice O'Connor concurred on the ground that there was evidence that there was considerable use of the airspace at altitudes of 400 feet and greater and no reasonable expectation of privacy from such aerial observation. 488 U.S. at 454-55, 109 S.Ct. at 699, 102 L.Ed.2d at 845. The dissenters, like Justice O'Connor, focused on whether the residents had a reasonable expectation of privacy in this garden within the curtilage. 488 U.S. at 460-61, 109 S.Ct. at 702, 102 L.Ed.2d at 848-49 (Brennan, J. dissenting).
In this case, the flight over the residence and curtilage was preparatory and incidental to location and observation of cornfields, which are not constitutionally protected. There was no unreasonable governmental intrusion.
Affirmed.
NOTES
[1] Judge Lisa did not participate in oral argument. However, the parties consented to his participation in the decision. R. 2:13-2(b).
[2] Neither the videotape nor the diagram is among the exhibits provided on appeal.
[3] According to the plurality, Federal Aviation Administration regulations in effect at the time provided that "helicopters may be operated at less than the minimums for fixed-wing aircraft `if the operation is conducted without hazard to persons or property on the surface.'" 488 U.S. at 452, 109 S.Ct. at 697, 102 L.Ed.2d at 843, n. 3 (quoting 14 C.F.R. § 91.79 (1988)).